Filed 9/4/24  In re D.G. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.G.,<br><br>Defendant and Appellant. | F087846<br><br>(Super. Ct. No. JD143296-00)<br><br>**OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Christie Canales Norris, Judge.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Margo A. Raison, County Counsel, and Jennifer E. Feige, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]	Before Franson, Acting P. J., Meehan, J. and DeSantos, J.

R.G. (mother) appeals the juvenile court's order terminating her parental rights to her now six-year-old daughter, D.G.[1] (Welf. & Inst. Code, § 366.26.)[2] Mother contends the order must be reversed because the juvenile court erred in not applying the beneficial parent-child relationship exception to the termination of her parental rights. (§ 366.26, subd. (c)(1)(B)(i).) We disagree that the juvenile court so erred.

Mother also contends the Kern County Department of Human Services (department) and the juvenile court failed to comply with the initial inquiry requirements of section 224.2 of the California Indian Child Welfare Act (Cal-ICWA), the state analogue to the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.), because extended maternal family members were not asked whether daughter is or may be an Indian child.[3] The department concedes it failed in its duty of inquiry. We accept the concession, conditionally reverse the juvenile court's order terminating parental rights, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Daughter came to the department's attention at the end of April 2022, after receiving a referral alleging mother's home was unsuitable and mother and maternal grandmother engaged in daily verbal and physical altercations in front of daughter. An investigation revealed that mother's home was flooded and smelled of mold, and mother

---

[1]     Daughter's alleged father, G.O. (father), did not personally appear during these proceedings and was never elevated beyond the status of an alleged father. His whereabouts were unknown for much of the case and while he was located by the section 366.26 hearing, he was incarcerated and apparently elected not to attend the hearing. He is not a party to this appeal.

[2]     Undesignated statutory references are to the Welfare and Institutions Code.

[3]     As our Supreme Court recently explained in *In re Dezi C.* (Aug. 19, 2024, S275578) ___ Cal.5th ___, ___, fn. 1 [2024 Cal. LEXIS 4634 *2, fn. 1] (*Dezi C.*), we use the term "Indian" as it is the term used in both federal and state law. No disrespect is intended.

2.

and maternal grandmother got into a violent argument in front of daughter and the social worker.

When the social worker interviewed mother, she denied Native American or Alaskan Eskimo ancestry and stated her ethnicity was Hispanic. Mother provided the names of her relatives—a sister, D.S., who had legal guardianship of three of mother's children,[4] and a sister, V.A. The social worker spoke with both maternal aunts, as well as maternal great-grandfather and maternal grandmother, but did not document asking them about whether the family had Indian heritage.

The department detained daughter and filed a dependency petition under section 300, subdivision (b), alleging mother and maternal grandmother engaged in daily verbal and physical altercations in front of daughter, daughter witnessed them curse at and punch each other, and law enforcement was contacted twice due to the verbal altercations. The petition further alleged mother's residence was unsuitable because it was flooded after an underground pipe broke, there was a strong odor of mold emitting from the residence, and while mother agreed to take daughter to "the Mission,"[5] mother did not do so and instead returned to the residence.

At the May 2, 2022 detention hearing, mother appeared with counsel. Mother signed a PARENTAL NOTIFICATION OF INDIAN STATUS (ICWA-020) form stating none of the Indian status items applied. The juvenile court stated it had the form and mother confirmed it was correct. In answer to the juvenile court's questions, mother stated to her knowledge no one in her family had lived on a reservation or received tribal

[4] Mother has eight children by four different fathers. Two of her children are adults who were raised by their father, while five children were still minors in legal guardianship with mother's sisters. Daughter is mother's eighth child.

[5] The Mission is a recovery program that provides mothers with substance abuse counseling, random drug testing, parenting classes, and assistance with getting families back into self-sufficiency. Mother was in the program in 2018, but she could participate again.

benefits. The juvenile court asked mother to notify the social worker and her attorney if she received new information indicating she might have Native American heritage. The juvenile court found ICWA did not apply as it had no reason to know daughter may be an Indian child as defined by ICWA and there was no evidence to establish that daughter was a member or eligible for membership in a federally recognized tribe. Although maternal aunt, V.A., attended the hearing, the juvenile court did not inquire of her concerning potential Indian heritage. The juvenile court detained daughter from mother and ordered twice weekly two-hour supervised visits for mother.

At the May 3, 2022 hearing, the juvenile court appointed a guardian ad litem for mother at her attorney's request following a confidential hearing. After mother requested a contested jurisdiction/disposition hearing, the court set a mediation for June 13, 2022, and the jurisdiction/disposition hearing for June 20, 2022.

### *The Jurisdiction Hearing*

At the June 20, 2022 hearing, mother appeared with counsel, her guardian ad litem, and a worker from The Mission. County counsel announced that the social worker located father. The juvenile court appointed counsel for father and continued the hearing to July 25, 2022.

At the July 25, 2022 hearing, the juvenile court granted mother's counsel's request to relieve the guardian ad litem. Father did not appear at the hearing and the department filed the social worker's diligent search declaration stating father could not be located. The juvenile court found the petition's allegations true after mother submitted on the report with a signed waiver as to jurisdiction. The juvenile court granted the department's request for a psychological evaluation of mother and appointed Dr. Michael Musacco to determine what services would be provided and were appropriate for mother. The juvenile court continued the disposition hearing.

4.

*The Disposition Hearing*

Dr. Musacco evaluated mother on August 23, 2022. He diagnosed her with unspecified schizophrenia spectrum disorder, unspecified depressive disorder, and stimulant use disorder, which reportedly was in remission. Mother, who was 37 years old, admitted a history of daily methamphetamine use beginning when she was 15. She maintained sobriety when she was in the Mission program, but relapsed in April 2022, when she moved in with maternal grandmother. Dr. Musacco stated mother was reasonably bright and clearly cared for daughter, but she often made comments that suggested the presence of psychotic symptoms. Mother, however, completely denied any possibility she had a mental illness to the extent she became hostile and offended when anyone suggested she may be exhibiting symptoms of a mental illness.

Dr. Musacco opined that mother required psychiatric treatment to safely reunify with daughter, but he was concerned she may not be amenable to, or compliant with, treatment because she did not believe she was mentally ill and attributed her difficulties to others' actions. He recommended that mother be referred for psychiatric treatment, including an evaluation for psychiatric medications, and to continue attending parenting classes and anger management and provide clean drug urine screens. Dr. Musacco suspected mother was predisposed to viewing child protective services and the department as entities which were against her or trying to foil her plans, which would make it more difficult for her to successfully comply with these recommendations.

The disposition hearing was held on October 5, 2022. Father did not appear at the hearing and his whereabouts remained unknown. The juvenile court reviewed the department's report, which recommended that mother be provided reunification services, and mother testified about the services she completed. Mother did not feel she had any mental health challenges. Mother's counsel requested family maintenance services.

The juvenile court commended mother on the classes she completed, but it was concerned about her mental health and shared Dr. Musacco's concerns about her lack of

5.

insight and paranoia that would affect her ability to reunify if they were not addressed. The juvenile court removed daughter from mother's custody and ordered reunification services for mother consisting of: (1) counseling for parenting, child neglect, and anger management; (2) a psychiatric evaluation at Kern County Behavioral Health & Recovery Services; and (3) compliance with a mental health treatment plan including medication. Mother also was ordered to submit to random drug testing at least monthly. Mother's visits were to occur twice weekly for two hours, supervised by the department or its designee.

The court set a section 366.21, subdivision (e) six-month review hearing for April 5, 2023.

*The Review Hearings*

Father was located by the April 5, 2023 review hearing, but his whereabouts later became unknown. The review hearing was continued several times for various reasons. Ultimately a combined six- and 12-month review hearing pursuant to section 366.21, subdivisions (e) and (f), was held on August 2, 2023. The department recommended termination of mother's reunification services and the setting of a section 366.26 hearing. Mother testified at the hearing.

The department made an offer of proof that the family services worker would testify that due to her unexpected absence from work, mother had not had visits and was owed approximately six hours of visitation, which they were in the process of making up. Mother's counsel requested mother receive continued services under family maintenance or, in the alternative, continued reunification services.

The juvenile court continued family reunification services for mother and ordered a second evaluation with Dr. Musacco. It found mother had regular and consistent visits with significant progress in resolving the problems that led to daughter's removal, and there was a substantial probability daughter would be returned to mother within six

months if services were continued. The court set a section 366.22 hearing for October 27, 2023.

Dr. Musacco re-evaluated mother on September 28, 2023. Mother was receiving psychiatric treatment and was prescribed antipsychotic and antidepressant medications, which she reported were helpful and she no longer heard voices. Dr. Musacco's diagnostic findings remained the same, but mother's conditions appeared to be in remission due to the psychiatric treatment. Mother was not convinced she experienced symptoms of a sustained mental illness and hypothesized some of her odd perceptions may have been due to her methamphetamine use.

Dr. Musacco concluded the case was complex relative to dependency issues, as mother admitted she did not believe she had a mental illness and did not plan to stay on her medications once the dependency proceedings ended. Mother's symptoms could return if she stopped complying with her medications and daughter would be placed in the same circumstances she was in when she was removed from mother's custody. But if mother possessed a drug-induced psychiatric disorder, she may not experience a resurgence of her psychiatric symptomology if she remained drug free. Overall, Dr. Musacco recommended that mother continue to comply with psychiatric treatment to ensure daughter's best interests.

In a report for the section 366.22 hearing, the department asserted there was not a substantial probability daughter could be returned to mother within six months, as mother was not committed to staying on her psychotropic medication or recognized her behavior caused daughter's removal. The department recommended termination of mother's reunification services and the setting of a section 366.26 hearing.

The section 366.22 hearing was continued several times and ultimately held on December 4, 2023. At the hearing, mother's counsel made an offer of proof that mother would testify she did not tell Dr. Musacco that she would not continue her medication. The juvenile court was concerned about whether mother had true insight into her mental

health diagnoses and mother's credibility about whether she could continue taking medication. It appeared to the court that she did not intend to continue taking the medications and she did not truly believe she had a mental health diagnosis. The court, therefore, followed the department's recommendation, terminated reunification services, and set a section 366.26 hearing for April 2, 2024.

***The Section 366.26 Hearing***

In its report for the section 366.26 hearing, the department recommended termination of parental rights and adoption as daughter's permanent plan. The report's ICWA status section stated that on May 2, 2022, the juvenile court found as to mother that there was no reason to know daughter was or may be member of, or eligible for membership in, a federally recognized tribe, and the department had a continuing duty of inquiry in compliance with ICWA.

Daughter had resided with her maternal aunt and uncle since May 2022, who expressed their commitment to adopting daughter. They loved her and wanted to provide a safe environment for her. Daughter, who was nearly six years old, was considered specifically adoptable based on her age and behavior concerns. Daughter looked to the caregivers to meet her daily physical and emotional needs. The social worker opined the benefits of a permanent adoptive home outweighed any detriment she might experience from termination of parental rights.

The social worker spoke with daughter about her feelings toward permanency, explained the difference between long-term foster care, guardianship, and adoption, and told her the caregivers wanted to adopt her. When the social worker asked daughter if she wanted them to adopt her, daughter said "yes," and stated it was because they were her favorite mom and dad, her aunt "loves me and treats me well," her uncle was "really nice," she liked living in the home, and she felt safe.

The department reported that between the time daughter was brought into protective custody until the writing of the assessment, mother had the opportunity to visit

192 times, and there were 101 visits documented in the department's case management system. According to the documentation, mother and daughter played during visits, and mother interacted appropriately with daughter by talking with her, giving her hugs and kisses, and redirecting when needed. Daughter's caregivers reported daughter did not show signs of distress after visits. The report included documentation of four visits that occurred in May 2022, April 2023, and January and March 2024.

The department stated mother had visited sporadically since daughter was placed into protective custody about 22 months ago, daughter reported visits were okay, daughter did not demonstrate major signs of distress or difficulty transitioning after visits, and their relationship had diminished into a visiting relationship. For these reasons, the mother/daughter relationship was minimal, and because permanency was in daughter's best interest, it would not be detrimental to terminate mother's parental rights for the purposes of adoption.

The report explained why the department believed it would not be detrimental to terminate parental rights. While mother was daughter's primary caretaker when she was taken into protective custody, daughter had been out of mother's care for nearly two years, and she now had a visiting relationship with mother. Mother attended nearly half of available visits, and while the visits went well, with play and affection, daughter did not show signs of distress when leaving mother after visits, did not look to mother for her daily needs, care and support, and the parental relationship between mother and daughter was minimal. Daughter did not have a relationship with father, had never lived with him, and he had not had any contact with her since she was placed in parental custody.

Mother did not appear for the April 2, 2024 section 366.26 hearing. The juvenile court received and reviewed the department's report. Mother's counsel lodged a general objection but presented no evidence or authority. Father's counsel was able to confirm father received a copy of the department's report and stated father hoped his mother, who had some of daughter's siblings, would be able to have custody. While paternal

9.

grandmother made efforts to call the department, the department did not return her calls. Father's counsel objected to the recommendation but had no further evidence or authority to offer.

The juvenile court noted mother attended 101 out of 192 offered visits, and the evidence did not show regular and consistent visitation by mother. Daughter had been in protective custody for nearly two years, and while daughter had an attachment with mother, the evidence did not show it was a substantial, positive, emotional attachment. The juvenile court also noted daughter's own statements about her desire to be adopted by her relative caregivers. The juvenile court believed the evidence showed the benefits of adoption outweighed any detriment and followed the department's recommendations. It found clear and convincing evidence daughter was likely to be adopted and terminated parental rights.

## DISCUSSION

## I. Beneficial Parent-Child Relationship Exception

Mother contends the juvenile court erred in terminating parental rights rather than properly considering and applying the beneficial parent-child relationship exception under section 366.26, subdivision (c)(1)(B)(i) pursuant to the guidelines set forth by our Supreme Court in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We disagree.

### A. The Elements of the Exception and Standard of Review

When the juvenile court finds by clear and convincing evidence the child is adoptable it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent claiming an exception to adoption has the burden

10.

of proof to establish by a preponderance of evidence that the exception applies.  (*In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252.)

To establish the beneficial parent-child relationship exception, the parent must show by a preponderance of the evidence three elements:  (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child.  (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636.)  In assessing whether termination would be detrimental, the juvenile court "must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Id.* at pp. 631–632.)  When the parent meets this burden, the exception applies such that it would not be in the child's best interest to terminate parental rights and the court selects a permanent plan other than adoption.  (*Id.* at pp. 636–637.)

The first element of the exception asks the "straightforward" question of whether the parent visited consistently, considering the extent permitted by court orders.  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The focus is on the best interest of the child as opposed to punishing or rewarding parents for good behavior in maintaining contact.  (*Ibid.*)  The second element asks whether "the child would benefit from continuing the relationship."  (*Caden C.*, *supra*, 11 Cal.5th at p. 629.)  The parent-child relationship "may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Id.* at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  The juvenile court's focus should again be on the child, and it "must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern."  (*Caden C.*, at p. 632.)  "[T]he parent must show that the child has a substantial, positive, emotional attachment to the parent— the kind of attachment implying that the child would benefit from continuing the relationship."  (*Id.* at p. 636.)

11.

When considering the third element, courts must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The court is guided by the child's best interest in a "specific way: it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' " (*Ibid.*) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[]' the child, the court should not terminate parental rights." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Id.* at pp. 633–634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Id.* at p. 634.)

We review the first two elements of the test for substantial evidence and the third for an abuse of discretion. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) In reviewing for substantial evidence, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) "Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

Since mother bears the burden of establishing that the beneficial parent-child exception applies, a juvenile court's findings that visitation has not been regular or that the relationship is not beneficial may be reversed only if the juvenile court applied the

12.

wrong legal standard and the evidence would support a finding for the parent (*In re J.D.* (2021) 70 Cal.App.5th 833, 865; *In re J.R.* (2022) 82 Cal.App.5th 526, 533), or the evidence compels a finding in favor of the parent on these issues as a matter of law (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647 (*Breanna S.*), disapproved of on other grounds in *Caden C.*, *supra*, 11 Cal.5th at p. 637, fn. 6; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528 ["where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"], disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1003, fn. 4).

## B.     Forfeiture

As the department argues, the failure to raise the beneficial parent-child relationship exception in the juvenile court forfeits it as an issue on appeal. (See *In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295 ["[t]he juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies"]; see also *In re Daisy D.* (2006) 144 Cal.App.4th 287, 292 [same, with regard to the beneficial sibling relationship exception]; *In re Melvin A.*, *supra*, 82 Cal.App.4th at p. 1252.)

Here, mother's counsel did not argue at the section 366.26 hearing that the beneficial parent-child relationship exception to termination of parental rights applied. Her attorney simply lodged a general objection and did not present any evidence or authority. Therefore, mother forfeited her contention.[6]

---

[6]     Mother argues her attorney's general objection preserved the issue and points out that the juvenile court made a brief record addressing the exception. Absent mother raising the applicability of the exception, however, the juvenile court did not have a duty to determine whether the exception applied. Mother also points out the department discussed the elements of the exception in its report and asserts the department does not suggest it would have presented additional evidence had she made a different or more specific objection. Mother, however, ignores that it is her burden, not the department's, to prove the exception applies.

13.

### C. Mother Did Not Meet Her Burden of Showing the Exception Applied

Even assuming the issue was not forfeited, we conclude the juvenile court, which ruled on the beneficial parent-child relationship exception despite mother's failure to raise it, did not err in rejecting the exception. The exception clearly did not apply on the facts of the present case, and the juvenile court's finding would be upheld under any standard of review.

On the first element, the juvenile court found mother did not regularly visit or contact daughter, based on the department's report which stated that mother visited 101 out of 192 times. Mother argues substantial evidence does not support this finding because at the August 2023 review hearing, the juvenile court found mother had regular and consistent visits with daughter and in October 2023, the department reported mother had regular visits. That other evidence exists in the record to reach a contrary finding, however, is irrelevant to whether the juvenile court's finding is supported by substantial evidence. The department's report for the section 366.26 hearing provides the evidence necessary to support the finding that mother did not regularly and consistently visit daughter.

But even if mother regularly and consistently visited daughter, mother has not met her burden on appeal of showing the evidence compels a finding as a matter of law that daughter has a "substantial, positive, emotional attachment" to her such that daughter would benefit from continuing the relationship. Mother does not cite any evidence in her appellate briefs that would support such a finding, but rather makes a conclusory assertion that legal guardianship would allow daughter to continue her relationship with mother. Nevertheless, the juvenile court's finding on this element is supported by daughter's own statements to the social worker. While the social worker did not ask daughter whether she wanted to continue her relationship with mother, the social worker explained adoption to her in simple terms and when asked if she would like her caregivers to adopt her, she answered yes and said it was because the caregivers were her

14.

favorite mom and dad, she liked living in the home, and she felt safe. Her willingness to sever ties with mother indicates she did not have a substantial, positive emotional attachment to mother such that maintaining the parent-child relationship would benefit her.

That same evidence answers the ultimate question: i.e., whether daughter's relationship with mother was so important to her that the detriment to her of losing that relationship outweighed the security and stability of a new home with her maternal aunt and uncle. Moreover, given the facts that daughter spent nearly two years of her life in foster care, exhibited no signs of distress when separated from mother at the conclusion of visits, and had developed a significant relationship with her caregivers, the juvenile court did not abuse its discretion in determining that the benefits of adoption outweighed any detriment daughter might suffer from the termination of mother's parental rights.

## II.    ICWA Inquiry

Mother asserts the department had contact with, or knew of, maternal family members, including maternal great-grandfather, maternal grandmother, and maternal aunts, but neglected to ask these family members whether daughter had Indian ancestry. Therefore, she argues, the department failed to fulfill its duty of initial inquiry under ICWA, and the juvenile court erred in finding ICWA did not apply. We concur.

### A.    ICWA Inquiry Duties and Standard of Review

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption of foster care placement with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) The California Legislature enacted Cal-ICWA to "affirm ICWA's purposes (§ 224, subd. (a)) and mandate compliance with ICWA '[i]n all Indian child custody proceedings' (§ 224, subd. (b))." (*In re Isaiah W.*, at p. 9.)

Under Cal-ICWA, the juvenile court and the department have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2,

15.

subd. (a).) An " 'Indian child' " is defined in the same manner as under federal law, i.e., as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); accord, § 224.1, subd. (a) [adopting the federal definition].)

This "duty to inquire begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) When the department takes a child into its temporary custody, the duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child …." (§ 224.2, subd. (b).) ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [extended family member "defined as provided in Section 1903" of ICWA.)[7]

The juvenile court, in turn, at a party's first appearance, must ask "each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" (§ 224.2, subd. (c)) and require each party to complete an ICWA-020 form (Cal. Rules of Court, rule 5.481(a)(2)(C)).[8] "The parties are instructed to inform the court 'if they subsequently receive information that provides reason to know the child is

---

[7] "While this duty of inquiry is sometimes referred to as the initial duty of inquiry, this is a bit of a misnomer, as the duty 'continues throughout the dependency proceedings.' " (*Dezi C., supra*, ___ Cal.5th ___ at p. ___ [2024 Cal. LEXIS 4634 *15].)

[8] All further references to rules and to the California Rules of Court.

16.

an Indian child.' (25 C.F.R. § 23.107(a) (2020); § 224.2, subd. (c).)" (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

If the initial inquiry gives the juvenile court or department a "reason to believe that an Indian child is involved," then their duty to "make further inquiry regarding the possible Indian status of the child" is triggered. (§ 224.2, subd. (e).) If that further inquiry results in a reason to know the child is an Indian child, then the formal requirements of section 224.2 apply. (§§ 224.2, subd. (f) & 224.3, subd. (a)(5).)

In addition, the department is required by the rules to document its inquiries. Rule 5.481(a)(5) provides: "The petitioner must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes. Whenever new information is received, that information must be expeditiously provided to the tribes."

The juvenile court may find ICWA does not apply to a child's proceeding if it finds "an agency's inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child." (*Dezi C.*, *supra*, ___ Cal.5th at p. ___ [2024 Cal. LEXIS 4634 *18]; § 224.2, subd. (i)(2); rule 5.481(b)(3)(A).) The juvenile court's finding that ICWA does not apply thus " ' "implies that … social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.) Nevertheless, an agency and the court have a continuing duty under ICWA and if the court subsequently receives information providing a reason to believe the child is an Indian child, it "shall reverse its determination" and order further inquiry be conducted. (§ 224.2, subd. (i)(2).)

"The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' " (*Dezi C.*, *supra*, ___ Cal.5th at p. ___ [2024 Cal. LEXIS 4634 *18]; § 224.2, subd. (i)(2).) We review a juvenile court's ICWA

17.

findings under a hybrid substantial evidence/abuse of discretion standard, reviewing for substantial evidence whether there is reason to know a child is an Indian child, and for abuse of discretion a juvenile court's finding that an agency exercised due diligence and conducted a "proper and adequate" ICWA inquiry. (*In re K.H.* (2022) 84 Cal.App.5th 566, 601 (*K.H.*).)[9] In assessing prejudice stemming from an inquiry error, "the focus is on the missed opportunity to uncover relevant information necessary to make a reliable, informed determination concerning whether the child is or may be an Indian child." (*K.H.*, at p. 609.)

### B.     The Department and Juvenile Court's Inquiries

Pursuant to its duty under section 224.2, the juvenile court noted mother completed an ICWA-020 form to determine whether she had any Indian heritage and confirmed with mother that she did not believe she had any Indian ancestry. The juvenile court, however, did not ask the maternal relative who was present at the hearing whether the family had Indian heritage. In addition, there is no evidence the department asked mother about any relatives it could ask about daughter's potential Indian ancestry. Although the department identified maternal relatives, including maternal great-grandmother, maternal grandmother, and maternal aunts, some of whom it spoke to, there is no evidence the department asked the family members it spoke to about daughter's Indian ancestry or attempted to contact the other identified family members.

---

**9**     Our Supreme Court recognized in the recent cases of *In re Kenneth D.* (Aug. 19, 2024, S276649) ___ Cal.5th ___, ___ [2024 Cal. LEXIS 4633 *14], and *Dezi C.*, *supra*, ___ Cal.5th at pp. ___ [2024 Cal. LEXIS 4634 *18–19] that there is a split of authority among the Courts of Appeal regarding the standard for reviewing a juvenile court's finding that ICWA does not apply. The Supreme Court, however, did not resolve the issue as in both cases it was undisputed the Cal-ICWA inquiry was inadequate. (*Kenneth D.*, at pp. ___ [2024 Cal. LEXIS 4633 *14–15]; *Dezi C.*, at p. ___ [2024 Cal. LEXIS 4634 *19].) Accordingly, we continue to apply the standard of review we articulated in *K.H.*, *supra*, 84 Cal.App.5th at p. 601.

As the department and juvenile court only asked mother about any potential Indian ancestry and the department failed to inquire of other extended family members with whom it came into contact or had contact information, the department failed to fulfill its initial inquiry obligations.[10] Accordingly, substantial evidence does not support a finding that the department conducted an adequate inquiry under ICWA, and the juvenile court abused its discretion in finding ICWA did not apply.

### C.  Prejudice

Our Supreme Court recently resolved a conflict among the Courts of Appeal regarding "whether a child welfare agency's failure to make the statutorily required initial inquiry under California's heightened ICWA requirements constitutes reversible error." (*Dezi C.*, *supra*, ___ Cal.5th at p. ___ [2024 Cal. LEXIS 4634 *2].)  The Supreme Court held that "an inadequate Cal-ICWA inquiry requires conditional reversal of the juvenile court's order terminating parental rights with directions to the agency to conduct an adequate inquiry, supported by record documentation." (*Dezi C.*, at p. ___ [2024 Cal. LEXIS 4634 *3].)

Here, the extent of the department's inquiry was confined to asking mother if she had any Indian ancestry and recording her negative response.  The department, however, either came into contact with or identified maternal relatives who fall within ICWA's definition of an extended relative.  The record is silent on what efforts, if any, were made to contact those relatives to comply with ICWA or whether relatives the department spoke with were asked about potential Indian ancestry.  "Where a record is silent or nearly silent with respect to an ICWA inquiry at the first step, a finding of harmlessness

---

[10]  A department's inquiry is inadequate where it extended no further than the parents and the department failed to ask readily available extended family members who it interviewed regarding the dependency petition's allegations whether the parents or children have Indian ancestry. (*Dezi C.*, *supra*, ___ Cal.5th at pp. ___ [2024 Cal. LEXIS 4634 *5, 33–34].)

19.

necessarily rests on speculation" and "is at odds with the statutory protections that ICWA and California law intend to afford Indian children and Indian tribes." (*K.H.*, *supra*, 84 Cal.App.5th at p. 611.)

Our Supreme Court has confirmed that where, as here, the sole infirmity in the judgment is the failure to conduct an adequate Cal-ICWA inquiry, it is impossible to review for prejudice a juvenile court's finding that ICWA does not apply. (*Dezi C.*, *supra*, ___ Cal.5th at p. ___ [2024 Cal. LEXIS 4634 *25].) In that situation, conditional reversal of the judgment is required: "Upon a conditional reversal, the Department will make additional inquiry and documentation efforts consistent with its duties and the court shall hold a hearing thereafter to determine whether, in light of the outcome of the inquiry as documented, ICWA applies. If the juvenile court determines the inquiry is proper, adequate, and duly diligent and concludes that ICWA does not apply, any inquiry error is cured, and the judgment would be reinstated. [Citation.] In contrast, if the inquiry reveals a reason to know the dependent child is an Indian child, the tribe has been notified (see § 224.3, subd. (a); 19 U.S.C. § 1912), and the tribe determines the child is a member or citizen, or eligible for membership or citizenship, of an Indian tribe (see § 224.1, subd. (b); 25 U.S.C. § 1903(4)), ICWA applies, and the judgment must be reversed." (*Dezi C.*, at pp. ___ [2024 Cal. LEXIS 4634 *25–26].)

Given the inadequacy of the department's and juvenile court's inquiry, which the department concedes, we must conditionally reverse the order terminating parental rights and remand for compliance with ICWA and Cal-ICWA.

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the department to comply with the inquiry and notice requirements of sections 224.2 and 224.3, and the documentation provisions of rule 5.481(a)(5), consistent with this opinion. If the juvenile court thereafter finds a proper and adequate further inquiry and due diligence has been

20.

conducted and concludes ICWA does not apply (§ 224.2, subd. (i)(2)), then the court shall reinstate the order terminating parental rights. If the juvenile court concludes ICWA applies, then it shall proceed in conformity with ICWA and California implementing provisions.